IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

AHMAD ISMAIL,                          §
                                       §
         Plaintiff,                    §
                                       §
v.                                     §         Civil Action No. 3:12-CV-3547-N
                                       §
TRAVIS BANNISTER, MATTHEW              §
LYNCH, and THE CITY OF                 §
RICHARDSON,                            §
                                       §
         Defendants.                   §

**ORDER**

This Order addresses two motions: Defendant City of Richardson's (the "City")

motion to dismiss Plaintiff Ahmad Ismail's complaint [Doc. 6] and Defendants Travis

Bannister and Matthew Lynch's (collectively the "Officers") motion for summary judgment

[25]. The Court grants both motions.[1]

### I. THE OFFICERS' SHOOTING OF ISMAIL[2]

Ismail brought this action to recover for injuries he sustained when he was shot by

Bannister and Lynch, two police officers who work for the City. At about 9:30 p.m. on

---

[1]In light of the Court's scheduling order [23], the Court denies Lynch's and Bannister's motions for Rule 7(a) replies [17, 18] and the Officers' motion for a protective order [19] as moot.

[2]For the purposes of the City's motion to dismiss, the Court accepts the facts pled in Ismail's complaint as true. When deciding the Officers' motion for summary judgment, however, the Court looks to the summary judgment record. Because the Court must examine the facts differently when addressing the two motions, the Court notes where the complaint and the summary judgment record differ. Unless otherwise noted, the facts presented below reflect both the facts alleged in the complaint and the undisputed facts in the summary judgment record.

September 27, 2010, Bannister was on duty in his police car.  He saw a white Nissan make an illegal turn, so he initiated a traffic stop.  Ismail, who was driving the white Nissan with a passenger in the front seat, pulled over into a parking lot.  Bannister recognized Ismail from a prior encounter a few days earlier in which he had arrested Ismail for possession of marijuana and drug paraphernalia.  According to the summary judgment record, the paraphernalia in question was a crack pipe.  Officers' App. Supp. Mot. Summ. J. [hereinafter Officers' App.] [27] 4–5.  According to Bannister, Ismail admitted during the previous incident that he had smoked crack cocaine that day.  *Id.*

When Bannister, who was wearing his police uniform, approached Ismail's car, Ismail rolled down his window part of the way.  Bannister asked Ismail for his driver's license, and Ismail handed it over.  According to the Officers' summary judgment evidence, Ismail appeared nervous, was sweating profusely, and became agitated and argumentative.  Officers' App. 7.  The video recording from Bannister's police cruiser's dashboard camera, which is included in the summary judgment record, shows that the exchange became heated at points.  Video from Bannister's Dashboard Camera [hereinafter Dashboard Video], Ex. A to Aff. of Debra Green, Officers' App. 28, at 22:33:50–35:07.  Bannister repeatedly asked Ismail what was in his hand, which was closed.  Ismail ultimately responded that it was only a ten dollar bill.  Around this time, Lynch arrived, also wearing his police uniform.  Lynch approached Ismail's vehicle on the passenger side.  Officer Vincent Gibson arrived around this time, too.

As Lynch approached the car, Bannister asked Ismail why there was marijuana or crack cocaine in Ismail's lap.  Bannister then instructed Ismail to open his car door.  Instead of complying, Ismail put his car into reverse and accelerated backwards.

Bannister and Lynch drew their guns, pointed them at Ismail, and shouted to Ismail to get out of his car.  He did not do so.  Instead, after about ten seconds, he shifted into drive and accelerated in the Officers' general direction. When Ismail accelerated, Bannister was standing to the driver's side of the vehicle.  The parties disagree about where Lynch stood.  The complaint alleges that Lynch was, like Bannister, to the driver's side of the car and not in front of it.  According to Lynch's, Bannister's, and Gibson's accounts in the summary judgment record, however, Lynch was "directly in front of the vehicle near its center."  Officers' App. 7, 15, 23.  Pamela Edinger, a passenger in Ismail's car, also told police that there was a police officer in front of the car when Ismail accelerated. Edinger interview, Ex. A to Aff. of Jack McQuarry, Officers' App. 41, at 4:23:55–4:24:10.  Based on the video, this officer could only have been Lynch.  Ismail, however, testifies that Lynch "was not standing in front of [the] car" but that "he was standing on the driver's side . . . , at least three feet to the left of [the] car and clearly out of the way."  App. Supp. Pl.'s Resp. Mot. Summ. J. [32] 4.  When Ismail backed his car up, he drove out of view of Bannister's dashboard camera.  The video recording shows where Lynch is standing, but it does not directly show where he stood in relation to the car.  On closer examination, however, the video proves conclusive.  The illumination of Ismail's headlights on Lynch's body and the position of Lynch's shadow in those same headlights demonstrate that Lynch was indeed in front of the car when Ismail attempted to flee. Dashboard Video 22:35:16–19.  The video does not corroborate Lynch's account that he was directly in front of the center of the car, but it does show that he stood somewhere in front of it and not, as Ismail claims, three feet to its left.  As Ismail accelerated, he turned his car to the right – away from the Officers.  The video recording

shows that Ismail's sudden acceleration caused Lynch to take several quick, stumbling steps backwards in an effort to get out of the way of the car. *Id.*

When Ismail attempted to flee, Bannister and Lynch discharged their firearms at the vehicle. Both fired multiple shots: according to the summary judgment record, Bannister fired four times and Lynch twice over the course of approximately two seconds. Officers' App. 7, 15–16, 22–23; Dashboard Video at 22:35:17–19. As Ismail drove away, the Officers chased him down. The summary judgment record reveals that they holstered their sidearms and fired no more shots at him or his car. The car eventually came to a stop while still in the parking lot, and the Officers arrested Ismail.

Two of the six shots the Officers fired at Ismail struck him: one in the shoulder, and the other in the spine. The shooting left Ismail with permanent damage. The bullet that hit him in the spine paralyzed him from the waist down. According to the complaint, Ismail will not be able to walk again or regain motion or feeling in the affected area of his body.

Ismail filed this action against the Officers and the City, seeking damages for his injuries and bringing several claims. First, he alleges pursuant to 42 U.S.C. § 1983 that Bannister and Lynch used excessive force in violation of the Fourth and Fourteenth Amendments. He also asserts a section 1983 claim against the City for failure to train the Officers properly. Finally, he alleges, alternatively to his section 1983 claim against the City, that the City was negligent and is liable under the Texas Tort Claims Act for his injuries. The City has moved to dismiss the two claims against it, and the Officers have moved for summary judgment on the claims against them.

## II. THE COURT GRANTS THE CITY'S MOTION TO DISMISS

### A. Standard of Review for Motions to Dismiss

When faced with a Rule 12(b)(6) motion to dismiss, a court must determine whether the plaintiff has asserted a legally sufficient claim for relief. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To meet this "facial plausibility" standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court generally accepts well-pleaded facts as true and construes the complaint in the light most favorable to the plaintiff. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012). But a court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. (internal citations omitted).

### B. Ismail Has Failed to Allege All the Elements of a Section 1983 Claim

Ismail first brings a section 1983 claim against the City, asserting that it violated his constitutional rights by failing to train the Officers properly. To state a section 1983 claim against a municipality, a plaintiff must allege three elements: (1) a policymaker, (2)

an official policy, and (3) a violation of a constitutional right whose "moving force" is the policy or custom. *See Monell v. Dep't. of Social Servs.*, 436 U.S. 658, 694 (1978); *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001). A municipality cannot incur section 1983 liability for its employees' actions under a respondeat superior theory. *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). Moreover, "isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski*, 237 F.3d at 578 (citing cases).

In this case, Ismail has failed to plead the elements of a section 1983 claim because he has not alleged the existence of a policymaker. He claims in his response brief that the Richardson Police Department was the policymaker. Pls.' Br. Resp. City's Mot. Dismiss [16] 3. This is insufficient; Ismail must identify an individual or group of individuals within the department, not the department itself. *See, e.g.*, *Webster v. City of Hous.*, 735 F.2d 838, 842 (5th Cir. 1984) (en banc) ("Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to *an official* to whom that body has delegated policy-making authority" (emphasis added, alteration in original)); *Fountain v. City of Plano Police Dep't*, No. 4:12-CV-26, 2012 WL 7149510, at *5 (E.D. Tex. Dec. 13, 2012), *report and recommendation adopted*, No. 4:12CV26, 2013 WL 593912 (E.D. Tex. Feb. 15, 2013) ("Nowhere in the amended complaint is a person or group of persons alleged to have been the final policymaker of the City."). This failure to identify a policymaker renders Ismail's complaint insufficient to state a claim for relief. *See Davenport v. City of Garland, Tex.*, No. 3:09-CV-798-B, 2010 WL 1779620, at *2 (N.D. Tex. Apr. 9, 2010), *report and recommendation adopted*,

3:09-CV-798-B, 2010 WL 1779619 (N.D. Tex. Apr. 30, 2010) (dismissing claim for failure to identify policymaker).

The Court notes, however, that Ismail has sufficiently alleged a policy: failure to train officers "on the proper use of force . . . during an investigatory stop/attempted arrest when a party attempts to flee the scene." Compl. [2] ¶ 25. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). If, as Ismail asserts, the Richardson Police Department did not train its officers regarding the proper use of force, that failure would amount to the sort of deliberate indifference identified in *Canton*. *See id.* at 390 n.10 ("[T]he need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." (citing *Garner*, 471 U.S. 1)).

Finally, the facts as pled are sufficient to allege that this alleged custom – failure to train – was the moving force behind Ismail's injury. In the complaint, Ismail alleges that Lynch and Bannister were to the side of Ismail's car and that neither was in danger of being stuck as he attempted to flee. Compl. ¶¶ 12–13. If true, these facts would sufficiently allege that the Officers' training in what to do in such situations was the moving force behind Ismail's injury.[3]

---

[3]The Court concludes below that the summary judgment record, particularly the video recording, contradicts the facts pled in the complaint and shows that Bannister and Lynch reasonably feared for Lynch's safety. *See infra* section III.C. The Court, however, cannot consider this material on a motion to dismiss.

### C. The TTCA Intentional Tort Exception
### Bars Ismail's Negligence Claim

Ismail's second claim against the City is for common-law negligence. Under the

doctrine of sovereign immunity, a governmental unit cannot incur tort liability unless the

legislature has waived that immunity. *Dallas Cnty. Mental Health & Mental Retardation*

*v. Bossley*, 968 S.W.2d 339, 341 (Tex. 1998) (citing *Harris Cnty. v. Dillard*, 883 S.W.2d

166, 168 (Tex. 1994)). The Texas Tort Claims Act ("TTCA") waives sovereign

immunity for some tort claims, though it "allow[s] suits to be brought against

governmental units only in certain, narrowly defined circumstances." *Tex. Dep't of*

*Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001). Specifically, the TTCA

provides as follows:

> A governmental unit in the state is liable for:
> (1) property damage, personal injury, and death proximately caused by
> the wrongful act or omission or the negligence of an employee acting
> within his scope of employment if:
>> (A) the property damage, personal injury, or death arises from the
>> operation or use of a motor-driven vehicle or motor-driven
>> equipment; and
>> (B) the employee would be personally liable to the claimant
>> according to Texas law; and
> (2) personal injury and death so caused by a condition or use of tangible
> personal or real property if the governmental unit would, were it a
> private person, be liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM. CODE § 101.021. The TTCA, moreover, expressly does not

waive a governmental unit's immunity as to claims "arising out of assault, battery, false

imprisonment, or any other intentional tort." *Id.* § 101.057(2). As relevant here, then, a

governmental unit may be liable for an injury to a plaintiff resulting from a use of

tangible personal property, so long as the claim does not arise out of an intentional tort.

Ismail alleges, in the alternative to his section 1983 claim, that the City is liable for his injuries because they resulted from the Officers' negligent use of their sidearms, which are tangible property.  The City maintains that the TTCA does not waive the City's sovereign immunity for this claim because the claim arises out of an intentional tort: the Officers' shooting.  Texas courts are split on how to address these claims, though the Texas Supreme Court has laid out the groundwork.  In *Texas Department of Public Safety v. Petta*, the plaintiff brought a claim under the TTCA, alleging that a police officer's conduct was negligent.  44 S.W.3d 575, 580 (Tex. 2001).  The Court, however, held that the conduct – hitting a car window, calling a tow truck, aiming a gun, blocking the plaintiff in with a police cruiser, and firing at the plaintiff's tires – was intentional and that the plaintiff's claim was therefore barred by sovereign immunity.  *Id.*

Since *Petta*, the apparent majority of courts have interpreted *Petta* to mean that "a negligence claim under the TTCA cannot arise out of the intentional *acts*, including excessive force, of a law enforcement officer against a person."  *City of Waco v. Williams*, 209 S.W.3d 216, 221 (Tex. App. – Waco 2006, pet. denied) (emphasis added).  For instance, in *Harris County, Texas v. Cabazos*, a police officer shot the plaintiff during a traffic stop.  177 S.W.3d 105, 111 (Tex. App. – Houston [1st Dist.] 2005, no pet.).  The complaint expressly asserted that the shooting was negligent, but the court nonetheless found that "the pleadings and other evidence pertinent to determining jurisdiction demonstrate that [the officer] intended to shoot [the plaintiff]."  *Id.* at 112.  The court therefore concluded that the TTCA's intentional tort exception barred liability.  *Id.* at 111–13.  In *City of Garland v. Rivera*, the plaintiff's father died after " police officers used pepper spray, handcuffs, a K-9 police service dog and 'other departmentally issued

property' to subdue him" during an arrest. 146 S.W.3d 334, 337 (Tex. App. – Dallas

2004, no pet.). The complaint alleged that the police used those items negligently, but, as

in *Rivera*, the court concluded that their use was intentional. *Id.* at 337–38. The

plaintiff's claim, concluded the Court, "hinge[d] on intentional conduct, as opposed to

negligent conduct," and the intentional tort exception applied. *Id.* at 338. *See also, e.g.*,

*Morgan v. City of Alvin*, 175 S.W.3d 408, 418–19 (Tex. App. – Houston [1st Dist.] 2004,

no pet.); *City of Laredo v. Nuno*, 94 S.W.3d 786, 788 (Tex. App. – San Antonio 2002, no

pet.). As one court summarized this line of reasoning, "[a] plaintiff cannot circumvent the

intentional tort exception by couching his claims in terms of negligence." *Cabazos*, 177

S.W.3d at 111; *see also Cox v. City of Ft. Worth, Tex.*, 762 F. Supp. 2d 926, 935 (N.D.

Tex. 2010) ("Even where a plaintiff labels his claim as 'negligence,' that claim will still

be barred if the label is merely a fiction or arises out of an intentional tort.")

Other courts, by contrast, have focused their inquiries not on whether the officers

intended their *acts*, but on whether they intended to *cause injury*. In *Durbin v. City of*

*Winnsboro*, for example, a police officer in a patrol car was chasing an individual on a

motorcycle. 135 S.W.3d 317, 318 (Tex. App. – Texarkana 2004, pet. denied). The

officer bumped the motorcycle in an attempt to stop it. *Id.* As a result, the motorcycle

crashed, and the rider died. *Id.* In an action brought by the rider's family, the court noted

that "the fundamental difference between a negligence cause of action and an intentional

tort is not whether the defendant intended his or her acts, but whether the defendant

intended the resulting injury." *Id.* at 324 (citing *Reed Tool Co. v. Copelin*, 689 S.W.2d

404, 406 (Tex. 1985)). It also observed that in *Petta* and various cases in the line

discussed above "the intent to injure can be inferred from the act alleged." *Id.* at 322.

ORDER – PAGE 10

Able to infer no such intent on the facts before it, the *Durbin* court determined that the plaintiff's claims did not arise under an intentional tort and that the TTCA's intentional tort exception did not bar liability.  *Id.* at 325; *see also Bridges v. Robinson*, 20 S.W.3d 104 (Tex. App. – Houston [14th Dist.] 2000, no pet.) (concluding  that police negligently employed "hog-tie" restraints and finding no intent to injure), *overruled in part on other grounds by Telthorster v. Tennell*, 92 S.W.3d 457, 464 (Tex. 2002) .

Under either line of cases, the Court concludes that the TTCA's intentional tort exception applies to this case.  Under the first, the facts as alleged in the complaint indicate that the Officers intentionally shot Ismail – nothing suggests that they accidentally discharged their weapons.  The complaint, then, alleges that the officers used excessive force against Ismail.  Ismail's negligence claim is thus barred by the intentional tort exception under this line of cases.  *See Petta*, 44 S.W.3d at 580 (finding claim barred where "the conduct [the plaintiff] complains of is the same conduct that forms the basis of her assault and battery claim"); *Williams*, 209 S.W.3d 216 (concluding that negligence claim arising out of officers' use of force against decedent was barred).

Under the second line, the Court can infer from the complaint that the Officers intended to cause injury.  Ismail pleads that, as he tried to escape from Lynch and Bannister, they "opened fire, both aiming at [Ismail] in an effort to stop his attempt to flee."  Compl. ¶ 16.  If these facts are true, as the Court must presume them to be, they are sufficient to support the conclusion that the Officers intended to injure Ismail by shooting him.[4]  *See Williams*, 209 S.W.3d at 224 (inferring "from the act of Tasering an intent to

_____

[4]Ismail argues that a jury could conclude from the facts as alleged in the complaint that the Officers intended only to stop his car and did not intend to injure him when they fired

cause an injury that is more than mere offensive touching"). This intent to injure is sufficient: "an actor need not intend the specific injury complained of for an intentional tort to be committed." *Id.* (citing *Tex. State Technical Coll. v. Wehba*, No. 11-05-00287-CV, 2006 WL 572022, at *2 (Tex. App. – Eastland Mar.9, 2006, no pet. h.) (mem. op.)). Because the Officers aimed their sidearms at Ismail and fired them, the Court concludes under that they intended to injure him. Under either line of cases, then, the TTCA's intentional tort exception bars Ismail's negligence claim.

### D. The Court Denies Ismail Leave to Amend

Ismail requested leave to amend his complaint in the event the Court were to grant the City's motion. Federal Rule of Civil Procedure 15 allows amendment once as a matter of course under circumstances not applicable here, and thereafter only with a court's leave or the opposing party's consent. FED. R. CIV. P. 15(a)(2). A "court should freely give leave when justice so requires," *id.*, but a grant of leave "is by no means automatic." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005). When deciding whether to grant leave, a court may consider such factors as undue delay, a movant's bad faith or dilatory motive, any previous failures to cure deficiencies, undue prejudice to the opposing party by virtue of allowing amendment, and futility of amendment. *Id.*

---

their weapons. This argument is unavailing. First, a court deciding a motion to dismiss looks to whether the plaintiff has stated a valid claim for relief – not to what a jury would or could decide. Second, the complaint clearly states that the Officers aimed *at Ismail.* Compl. ¶ 16. There is no allegation that they aimed at his tires, at his car, or even in his general direction. The Court must accept these facts as true and, as explained above, concludes from them that the Officers intended to harm Ismail.

In this case, amendment would be futile.  First, the Court concludes below that the Officers did not violate Ismail's constitutional rights when they shot him.  *See infra* section III.C.  Therefore, no matter how pled, a section 1983 claim against the City could not survive summary judgment.  Any amendment would thus be futile.  *See Adams Family Trust v. John Hancock Life Ins. Co.*, 424 F. App'x 377, 381–82 (5th Cir. 2011) (per curiam) (unpub.) (finding that attempt to replead would be futile where claim as amended would not survive summary judgment).  Second, the TTCA would bar Ismail's negligence claim, regardless of the manner in which it is pled.  Because any attempted amendment of Ismail's claims would be futile, the Court declines to grant Ismail leave to amend.

### E.  Conclusion as to Motion to Dismiss

The Court dismisses both of Ismail's claims against the City for failure to state a claim upon which relief can be granted.  His first claim is insufficient because he does not plead all of the required elements.  His second is barred by the doctrine of sovereign immunity because, under the facts as pled, it arises out of an intentional tort.  Because any attempt to amend the complaint would be futile, the Court denies leave to amend.

### III. THE COURT GRANTS THE OFFICERS'
### MOTION FOR SUMMARY JUDGMENT

Officers Bannister and Lynch are entitled to qualified immunity on Ismail's section 1983 claims against them. The Court therefore grants the Officers summary judgment on Ismail's claims.[5]

### A. Standard of Review for Motions
### for Summary Judgment

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, "he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). When the

---

[5]The Officers also assert that the summary judgment record shows – qualified immunity aside – that Ismail cannot succeed on his claims against them. The Court addresses the qualified immunity issue first. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (noting that courts should resolve immunity questions as early in litigation as possible). The key question in both arguments, though, is the same: did the Officers violate Ismail's constitutional rights? The Court finds, as explained below, that no violation occurred. The Court would therefore conclude that, even if Bannister and Lynch were not immune, Ismail's section 1983 claims for violations of his constitutional rights would fail.

nonmovant bears the burden of proof, the movant may demonstrate entitlement to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322–25.  Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).  Indeed, factual controversies are resolved in favor of the nonmoving party "'only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts.'"  *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

Where, as here, a court has access to video from the scene, the court should still "review evidence in the light most favorable to the nonmoving party," but it should also "assign greater weight, even at the summary judgment stage, to the facts evident from video recordings." *Carnaby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011).  Where a party's verbal account of a situation differs from the video recording, a court must consider "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).

### B. Qualified Immunity Standard

A governmental employee sued under section 1983 may assert the affirmative defense of qualified immunity. *White v. Taylor*, 959 F.2d 539, 544 (5th Cir. 1992). Qualified immunity shields government officials performing discretionary functions from liability for civil damages so long as their complained-of conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The Supreme Court in *Saucier v. Katz* set out a two-prong test for determining whether an official has qualified immunity. 533 U.S. 194, (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Specifically, a plaintiff must prove that (1) the official's conduct violated a constitutional or statutory right, and (2) the official's actions constituted objectively unreasonable conduct in the light of clearly established law at the time of the conduct in question. *See id.* at 201; *Tolan v. Cotton*, 713 F.3d 299, 304 (5th Cir. 2013). A Court may address the prongs in either order. *Pearson*, 555 U.S. at 236. The plaintiff bears the burden of proving that a defendant is not entitled to qualified immunity. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009).

### C. The Officers Are Entitled to Qualified Immunity

Ismail asserts that both Bannister and Lynch violated his constitutional rights by using excessive force when they fired their weapons at his car. A police officer's use of

excessive force may violate a plaintiff's Fourth Amendment rights if the plaintiff can prove that (1) he suffered an injury, (2) which resulted from the use of force that was clearly excessive to the need, and (3) the excessiveness of which was clearly unreasonable. *See Tolan*, 713 F.3d at 299. In this case, Ismail cannot satisfy the first *Saucier* prong because the facts in the record do not show a violation of a constitutional right. Specifically, under the third element of his excessive force claim, the facts show that the force the Officers used was not clearly unreasonable.

A police officer's apprehension of a suspect by the use of deadly force,[6] as here, constitutes a seizure that is subject to the Fourth Amendment's reasonableness standard. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). This standard is objective: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The inquiry is highly dependent on the facts of each case and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner*, 471 U.S. at 11. Furthermore, a court determining whether the use of deadly force is reasonable must consider "the fact that police officers are often forced

---

[6]Deadly force is defined as force "carry[ing] with it a substantial risk of causing death or serious bodily harm." *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998) (quoting *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988)) (alteration in original).

to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397; *Hathaway v. Bazany*, 507 F.3d 312, 320–21 (5th Cir. 2007). In sum, then, Ismail can satisfy the first *Saucier* prong only if he can point to summary judgment evidence raising a factual dispute about whether he posed a threat sufficient to justify a reasonable officer to respond with deadly force. *See Hathaway*, 507 F.3d at 321.

The Fifth Circuit has previously addressed similar questions in police shootings where suspects were attempting to flee in automobiles. *See id.*; *Sanchez v. Edwards*, 433 F. App'x 272 (5th Cir. 2011) (unpub.). The Court has identified two factors that are particularly relevant in determining whether the use of force was reasonable: (1) the amount of time the officers had to respond to the vehicle, and (2) the officers' proximity to the vehicle's path. *Hathaway*, 507 F.3d at 321 (citing *Waterman v. Batton*, 393 F.3d 471, 479 (4th Cir. 2005)). The Circuit has also suggested that an officer may act unreasonably in firing at a fleeing vehicle "after the perception of new information indicating the threat was past." *Id.* at 322.

In this case, the summary judgment evidence shows that the Officers' use of deadly force was not objectively unreasonable. The Officers had probable cause to suspect that Ismail's actions posed a threat of serious physical harm to Lynch, who was standing in front of Ismail's vehicle. The Court finds *Hathaway v. Bazany* particularly instructive in this regard. In that case, the officer was standing eight to ten feet in front of a car. *Id.* at 316. The car suddenly accelerated toward him, zigzagging as he tried to get out of the way and ultimately striking him on the leg. *Id.* The officer fired his sidearm

but could not remember whether he did so before, during, or immediately after the vehicle struck him. *Id.* These events unfolded "in the snap of a finger." *Id.* The Court determined that the officer's actions were objectively reasonable, particularly given his proximity to the car and the short time frame. *Id.* at 322. The Court noted that "second-guessing – even legitimate second-guessing – does not make his actions objectively unreasonable given the particular circumstances of the shooting." *Id.*

Considering the Fifth Circuit's reasoning in *Hathaway*, the Officers' actions in this case were reasonable. First, the video shows that they had only seconds to respond to Ismail's flight. The video does not show where Ismail stopped his car after backing up, but it is apparent from the strength of the headlights on Lynch's body and his hurried steps to move away from the car that the Officers had only a short time to react. Dashboard Video at 22:35:17–19. The video matches up with Bannister's testimony that Lynch was about a car's length in front of Ismail's vehicle. Officers' App. 7. Moreover, Bannister fired four bullets and Lynch fired two in the space of only two seconds, demonstrating that events unfolded very rapidly. Dashboard Video at 22:35:17–19; Officers' App. 7, 15–16.

Second, it appears that Lynch was at least close to Ismail's vehicle's path. The video shows Lynch taking several hurried, stumbling steps backwards in order to get out of the way. Moreover, he appears to have been only feet in front of the car when Ismail began accelerating forward. Dashboard Video at 22:35:17–19; Officers' App. 7. Even if Lynch was in front of the car but standing towards the driver's side, he was still close enough to the car's path to justify his and Bannister's reactions. When Ismail started

accelerating, there was no way for the Officers to know whether he would drive away from Lynch or swerve into him, as the driver did in *Hathaway*.  Lynch was generally in front of the car, placing him squarely in the zone of danger when Ismail suddenly accelerated.  Because of his proximity to the path of the car and the extremely limited time he and Bannister had to respond to the events that unfolded, the Officers' actions were reasonable.

Ismail also maintains that the last shots the Officers fired were unreasonable because the Officers fired them after Lynch was clearly safe.  Ismail asks the Court to examine the video frame by frame to determine when Lynch was plainly in no danger from the car and where in relation to the car the Officers were when they fired their last shots.  Taking this approach, however, risks ignoring the Officers' need to make split-second judgments in a tense, uncertain, rapidly evolving situation.  *See Graham*, 490 U.S. at 397; *Stroik v. Ponseti*, 35 F.3d 155, 158–59 (5th Cir. 1994) ("We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day.  What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." (quoting *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992))).  Seen in real time, it is clear that in the two seconds between when the Officers began firing and when they stopped, they did not have time to process any new information suggesting that Lynch was out of danger.  Once they did have time to react to the fact that the car had passed Lynch by, they holstered their sidearms and began to pursue Ismail.  This time frame differentiates this case from cases like *Waterman*, in which the officers continued

to fire at a fleeing suspect's vehicle after the car passed them and came to a stop. 393 F.3d at 481; *see Hathaway*, 507 F.3d at 322 (also distinguishing *Waterman*).

The Court, in sum, concludes that the video of the incident proves that Bannister and Lynch did not use excessive force in violation of Ismail's Fourth Amendment rights. The Court therefore need not address the second *Saucier* prong. *See, e.g.*, *Hathaway*, 507 F.3d at 322–23. The Officers are entitled to qualified immunity as to Ismail's section 1983 claims against them and, accordingly, to summary judgment on those causes of action.

CONCLUSION

The Court grants both the City's motion to dismiss and the Officers' motion for summary judgment. The Court denies Ismail leave to amend his complaint.

Signed May 30, 2013.

David C. Godbey
United States District Judge